**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Charles Glenn

    v.                         Civil No. 11-cv-475-JD

New Hampshire State Prison
Family Connections Center et al.[1]


**REPORT AND RECOMMENDATION**


Before the court is Charles Glenn's complaint (doc. no. 1), filed pursuant to 42 U.S.C. § 1983, asserting that his federal constitutional and statutory rights were violated by the defendants during his incarceration at the New Hampshire Department of Corrections ("DOC"). Because Glenn is a prisoner, the complaint is before the magistrate judge for a preliminary review. See United States District Court, District of New Hampshire Local Rule ("LR") 4.3(d)(2); see also 28 U.S.C. § 1915A.

---

[1] In addition to the New Hampshire State Prison ("NHSP") Family Connections Center ("FCC"), Glenn has named the following individuals as defendants to this action in their individual and official capacities: FCC Facilitator Kristina Toth, FCC Specialist Marry Kelly, FCC Administrator Lori Seog, New Hampshire Department of Corrections Acting Commissioner Christopher Kench, NHSP Warden Richard M. Gerry, NHSP Chaplain James Daly, and Northern New Hampshire Correctional Facility Warden Larry Blaisdell.

**Standard for Preliminary Review**

Pursuant to LR 4.3(d)(2) and 28 U.S.C. § 1915A, the magistrate judge conducts a preliminary review of prisoner complaints before defendants have an opportunity to respond to the claims.  The magistrate judge may direct service of the complaint, or, as appropriate, recommend to the district judge that claims be dismissed if:  the court lacks subject matter jurisdiction, a defendant is immune from the relief sought, the complaint fails to state a claim upon which relief may be granted, the allegation of poverty is untrue, or the action is frivolous or malicious.  See 28 U.S.C. § 1915A(a); LR 4.3(d)(2).

In determining whether to dismiss claims asserted in a pro se plaintiff's complaint for failure to state a claim upon which relief can be granted, the court decides whether the complaint, construed liberally, contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (pro se pleadings are construed liberally).  To make this determination, the court treats as true all well-pleaded factual allegations, and construes all reasonable inferences drawn therefrom in the plaintiff's favor, to determine if the claim is

plausible.  See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  Those inferences and allegations, taken as true, "must state a plausible, not a merely conceivable, case for relief."  Sepúlveda-Villarini v. Dep't of Educ., 628 F.3d 25, 29 (1st Cir. 2010); see also Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (citations and footnote omitted)).

## Discussion[2]

### I.  Religious Practice

#### A.  Facts

Glenn is a practicing Muslim.  Islamic law requires that Muslims attend Jum'ah services every Friday.  Glenn states that for the last three years, there have been no Jum'ah services at the New Hampshire State Prison ("NHSP").  Glenn states that the prison will not provide him with access to an Imam, or with a Qur'an or other Islamic literature.  Glenn also claims that he was not provided with a feast at the end of Ramadan, a religious observance undertaken by Muslims.  Glenn also briefly asserts

---

[2]The court finds that the allegations in the complaint are properly construed to assert claims for relief as identified herein.

that he has not been allowed to shave, eat, or pray, in accordance with the tenets of his religion.

On July 18, 2011, Glenn complained to NHSP Chaplain James Daly, in writing, about the lack of Muslim congregational worship and Jum'ah for the preceding three years.  Daly responded on July 26, 2011, that Muslim religious activities and worship services at the prison had to be led by volunteers. Daly stated that he had contacted two Islamic societies in New Hampshire, neither of which could provide a volunteer to lead Jum'ah services, and that Daly would "continue to reach out to these communities for support."

In the meantime, on July 22, 2011, Glenn filed a grievance with NHSP Warden Richard Gerry, complaining that he had not been able to attend Muslim services at the prison, including Jum'ah services, for more than three years.  On July 25, 2011, Gerry responded that there were no approved volunteers to provide such services, and that if one could be identified, time and space would be allocated for Muslim services.

On the day Gerry responded, Glenn complained in writing to the DOC Commissioner that there had been no Muslim services for three years, that Muslims had no place to congregate to worship, that he had no Qur'an or other Muslim literature, and that the prison had not accommodated his need for a Muslim diet, shaving

4

practices, or prayer requirements.  Christopher Kench, on behalf
of the DOC Commissioner, denied Glenn's grievance.  On August 6,
2011, Glenn again sent a grievance to the Commissioner,
reiterating his prior complaints, which Kench also denied.

Glenn asserts that the NHSP provides Christian worship
services approximately five days per week, and provides the
Christian Bible to inmates.  These services, Glenn claims, are
provided by two chaplains who are paid DOC employees.  The
prison does not fund a paid Imam position or provide Muslim
inmates with free Qur'ans.

B.   Legal Analysis

1.   Free Exercise Clause

The First Amendment's Free Exercise Clause "requires
government respect for, and noninterference with, the religious
beliefs and practices of our Nation's people."  Cutter v.
Wilkinson, 544 U.S. 709, 719 (2005).  This provision applies to
the states under the Fourteenth Amendment.  See Elk Grove
Unified Sch. Dist. v. Newdow, 542 U.S. 1, 6 n.4 (2004).

"[A] prison inmate retains those First Amendment rights
that are not inconsistent with his status as a prisoner or with
the legitimate penological objectives of the corrections
system," including the right to the free exercise of religion.

Pell v. Procunier, 417 U.S. 817, 822 (1974); see also O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citing Cruz v. Beto, 405 U.S. 319, 322 (1972)). The First Amendment protects the exercise of a prisoner's sincerely held religious beliefs only to the extent that the exercise does not contravene prison regulations that are "reasonably related to legitimate penological interests." See Beard v. Banks, 548 U.S. 521, 528 (2006) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). A court evaluating a claim that a prison regulation interferes with an inmate's rights under the Free Exercise Clause must accord prison administrators significant deference in defining legitimate goals for the corrections system, and for determining the best means of accomplishing those goals. See Overton v. Bazzetta, 539 U.S. 126, 132 (2003); Pell, 417 U.S. at 826-27; Kuperman v. Wrenn, 645 F.3d 69, 74 (1st Cir. 2011).

Under Turner, a court examining the constitutionality of a regulation that restricts an inmate's First Amendment free exercise of religion examines four factors:

> (1) whether there is a valid, rational connection between the regulation and the legitimate government interest put forward to justify it; (2) whether alternative means to exercise the right exist; (3) the impact that accommodating the right will have on prison resources; and (4) the absence of alternatives to the prison regulation.

Kuperman, 645 F.3d at 74 (citing Turner, 482 U.S. at 89-90).

At this stage of the proceedings, without evidence to the contrary in the record, the court finds that the volunteer policy, to the extent it denies Glenn all Jum'ah services, denies Glenn a central and essential religious practice, and thereby improperly impinges upon Glenn's First Amendment right to exercise his religion.  While further development of the factual record may demonstrate that the DOC's volunteer policy is a reasonable response to a legitimate penological concern, the court cannot make such a finding on the limited facts asserted in Glenn's complaint.  See Sparks v. Dennehy, No. 08-11437-PBS, 2009 WL 6490086, at *5 (D. Mass. Nov. 16, 2009) (order adopting report and recommendation) (complaint alleging that plaintiffs were denied, inter alia, religious services, stated claim upon which relief could be granted, where record did not contain facts to allow court to assess actions of corrections department).

Glenn's allegations concerning the Qur'an, Ramadan, shaving, eating, and prayer, while sparse, are sufficient to constitute a "short and plain statement" of Glenn's claim that his right to freely exercise his religion has been denied, see Fed. R. Civ. P. 8(a)(2), and to allow claims to proceed against Daly, Gerry, and Kench at this time.  Accordingly, in an order issued simultaneously with this report and recommendation

(hereinafter the "Simultaneous Order"), the court has directed

that Glenn's Free Exercise claims be served on defendants Daly,

Gerry, and Kench.

     2.  <u>RLUIPA</u>

The Religious Land Use and Institutionalized Persons Act,

42 U.S.C. § 2000cc-1(a) ("RLUIPA") provides protection to

institutionalized persons, including prison inmates, from

burdens on their religious exercise.  <u>See</u> <u>Bader v. Wrenn</u>, 675

F.3d 95, 97 (1st Cir. 2012).  RLUIPA's protection exceeds that

provided by the Free Exercise Clause.  <u>See</u> <u>id.</u>  RLUIPA states

that:

> [n]o government shall impose a substantial burden on
> the religious exercise of a person residing in or
> confined to an institution, . . . even if the burden
> results from a rule of general applicability, unless
> the government demonstrates that imposition of the
> burden on that person – (1) is in furtherance of a
> compelling governmental interest; and (2) is the least
> restrictive means of furthering that compelling
> governmental interest.

<u>Id.</u> (citing 42 U.S.C. § 2000cc-1(a)).  To state a claim under

RLUIPA, plaintiff must demonstrate that he is confined to an

institution, and that the government has imposed a "substantial

burden" on his religious exercise.  <u>See</u> <u>Crawford v. Clarke</u>, 578

F.3d 39, 43 (1st Cir. 2009) (citing <u>Spratt v. R.I. Dep't of</u>

<u>Corrs.</u>, 482 F.3d 33, 38 (1st Cir. 2007)).  Once such a showing

is made, the burden shifts to the government to demonstrate that the restriction is the least restrictive means by which a legitimate and compelling governmental interest may be achieved. See Crawford, 578 F.3d at 43; Spratt, 482 F.3d at 38.

Federal law does not define "substantial burden" for the purposes of RLUIPA.  The First Circuit has assumed, arguendo, however, that a substantial burden to religious exercise occurs when a challenged restriction "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." Spratt, 482 F.3d at 38 (citing Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 718 (1981)).

Glenn alleges that the volunteer policy places a substantial burden on his religious practice to the extent that it has effectively denied him access to Jum'ah services, where, for three years, no volunteers have been found to supervise the services at issue.  In the report and recommendation issued in Knapp v. Kench, 11-cv-491-PB (D.N.H. May 14, 2012) (doc. no. 14), this magistrate judge explained the reasons for ordering service of a similar RLUIPA claim challenging the impact of the volunteer policy on Muslim congregational worship.  For the same reasons here, this court finds that Glenn has stated a plausible claim for relief under RLUIPA.  See id., slip op. at 10-14 (distinguishing Bader, 675 F.3d at 98-99, for reasons including

that Muslim prisoner, unlike Bader, had been completely denied access to religious practices, and following Fifth Circuit cases, concluding that volunteer policies completely denying prisoners access to religious practices may be found to violate RLUIPA).  Here, Glenn, like the plaintiff in Knapp, has asserted that the volunteer policy effectively denies him access to Jum'ah services.  Accordingly, in an order issued on this date, the court has directed service of this claim on defendants.

In addition to his access to Jum'ah services, Glenn has alleged that his religious practice was substantially burdened by the denial of a Qur'an, the ability to practice Ramadan, and the ability to shave, eat, and pray in a manner consistent with the tenets of Islam.  The court finds that Glenn's allegations suffice, at this early stage of the proceedings, to assert a claim under RLUIPA upon which relief might be granted, and the court will direct that the claim proceed against defendants Daly, Gerry, and Kench.

### 3.   Establishment Clause

The First Amendment's Establishment Clause proscribes the government's involvement in religion, either to advance or inhibit its practice.  See U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion"); Lee v.

Weisman, 505 U.S. 577, 580 (1992).  The Establishment Clause is applicable to the states under the Fourteenth Amendment.  See Freedom from Religion Found. v. Hanover Sch. Dist., 626 F.3d 1, 6-7 (1st Cir. 2010), cert. denied, 131 S. Ct. 2992 (2011).  "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."  Larson v. Valente, 456 U.S. 228, 244 (1982).

Courts have analyzed prisoner complaints of Establishment Clause violations utilizing a "strict scrutiny" standard, where a policy facially demonstrates the state's preferential treatment of a particular religion.[4]  See, e.g., Rouser v. White, 630 F. Supp. 2d 1165, 1194 (E.D. Cal. 2009) (following Larson to apply strict scrutiny where prison employs chaplains in a manner that indicates a policy of preference of certain religions over others).  Glenn can state an Establishment Clause claim upon which relief might be granted, therefore, by demonstrating a prison policy that is not facially neutral, and that could plausibly be deemed not to be a narrowly tailored response to a legitimate penological objective.

---

[4]Whether the acts at issue in this case constitute acceptable and legally defensible responses to any compelling penological interest, and whether such a finding should be made under either a "strict scrutiny" or Turner analysis, may be addressed by the parties at a later stage of the proceedings, upon a more developed record than that presently before the court.

Glenn alleges that by offering Christian religious services conducted by state-employed chaplains and Christian Bibles at no cost, and not providing a paid Imam or Qur'ans to inmates, the prison is demonstrating a preference for Christianity over Islam.  On the face of the complaint, the court cannot find that the policy would survive strict scrutiny review.  Accordingly, Glenn has asserted sufficient facts to allow his Establishment Clause claim to proceed against Daly, Gerry, and Kench.

### 4.  Equal Protection

The Fourteenth Amendment's Equal Protection Clause provides that no state shall "deny any person within its jurisdiction equal protection of the law."  U.S. Const. amend. XIV.  This provision requires states to treat similarly situated people in a similar manner.  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).  Generally, to establish an equal protection claim, a plaintiff must demonstrate that: (1) compared with others similarly situated, he was selectively treated; and (2) that the selective treatment was motivated by purposeful discrimination on some improper basis, such as plaintiff's membership in a particular race or religion.  See Hernandez v. New York, 500 U.S. 352, 360 (1991).

Glenn asserts that by denying him a paid chaplain for religious services and failing to give him a religious text comparable to that provided to Christians, prison officials are treating him differently than similarly situated Christian inmates.  Again, as above, a more developed record may demonstrate the constitutionality of the prison's actions, but, at this time, the court finds that Glenn's equal protection claim states a plausible claim for relief against Daly, Gerry, and Kench, and directs service in the order issued on this date.

II.   <u>Removal from Family Connections Center</u>

    A.   <u>Facts</u>

In November 2009, Marry Kelly, a counselor at the Family Connections Center ("FCC")[5] at the NHSP, made certain comments that Glenn felt were offensive.  On November 30, 2009, Glenn complained to Kelly in writing, seeking an apology for her "lie[s]" and "discriminat[ion]."  On December 3, 2009, Glenn wrote to Kristina Toth, FCC Program Administrator, stating that he had tried to attend a father's support group that day, but Kelly denied him access because he had filed a grievance against

---

[5]The FCC is a DOC program that "strives to support families affected by incarceration through support, referrals, relationship classes and family re-entry planning available to eligible incarcerated fathers and their partners."  New Hampshire Department of Corrections, http://www.nh.gov/nhdoc/fcc/index.html (last visited May 29, 2012).

13

her, and she was not comfortable having Glenn in her class.  On
December 10, 2009, Glenn again wrote to Toth, stating that he
had tried to attend his regular support group that day, but was
again told by Kelly that she didn't want him in her group, and
further, that he could not return to the group until he met with
Toth.  On December 14, 2009, Toth met with Glenn and discussed
his complaints.

Glenn alleges that, on January 8, 2010, in retaliation for
filing grievances against Kelly, Toth listened to a telephone
call Glenn made to his fiancée, Katherine Silva.  While the
specific content of the call is not reported in the complaint,
Glenn states that Toth found Glenn's behavior during the call to
be verbally abusive to Silva.  As a result, Glenn was removed
from the FCC program, and from the father's support group for
six months, and he lost video visits he had been having with his
daughter through the FCC program.

On January 9, 2010, Glenn sent two inmate request slips to
FCC Administrator Lori Seog complaining about Toth monitoring
Glenn's phone conversation.  On January 10, 2010, Glenn sent a
third inmate request slip to Seog, complaining that: (a) Kelly
was unprofessional and had discriminated against him for kicking
him out of the father's support group due to Glenn's grievance;
(b) Toth had listened to his phone conversation with Silva; and

14

(c) he had suffered retaliation.  Seog responded to Glenn's complaints, stating that Glenn's removal from the FCC "[did] not correlate" to Glenn "bringing [his] concerns forward about support group."

In July and August 2010, Glenn filed grievances concerning his complaints about the FCC and its employees with Gerry, and Kench, alleging that he had been improperly kicked out of class, and his phone call had been monitored, in retaliation for his grievances against Kelly.  On July 23, 2011, Gerry responded to Glenn, stating, among other things, that all inmate phone calls are subject to monitoring by DOC staff and that Glenn's removal from the FCC program was based on Glenn's institutional behavior.  Kench responded to Glenn's grievance on August 11, 2011, stating that phone calls can be monitored by any DOC staff member with reason to do so.

B.   Legal Analysis

Glenn alleges that Kelly, Toth, and Seog retaliated against him for filing a grievance.  The First Amendment shields prisoners from retaliation in response to their engaging in protected speech. Ortiz v. Jordan, 131 S. Ct. 884, 893 (2011) (citing Crawford-El v. Britton, 523 U.S. 574, 592 (1998)).  In order to state a claim for retaliation for the exercise of his First Amendment rights, Glenn

15

must allege facts to demonstrate that: (1) the conduct which led to the alleged retaliation was protected by the First Amendment; (2) he was subjected to some adverse action at the hands of prison officials; and (3) there was a causal link between the exercise of Glenn's First Amendment rights and the adverse action taken.  See Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011), cert. denied, 132 S. Ct. 1105 (2012).

### 1.   Adverse Action

To satisfy the second element of a retaliation claim, Glenn must show that defendants took adverse action against him.  De minimis reactions to protected speech do not satisfy that requirement.  See Ingraham v. Wright, 430 U.S. 651, 674 (1977) ("There is, of course, a de minimis level of imposition with which the Constitution is not concerned").  A defendant's reaction to protected speech is not de minimis, however, if it would deter an individual of ordinary firmness from exercising his or her First Amendment rights.  See Starr v. Dube, 334 F. App'x 341, 342 (1st Cir. 2009).

Glenn states that Toth's act of listening to his phone conversation was an adverse act.  The record before the court at this time indicates that Glenn's phone calls may be monitored by any prison employee at any time.  Accordingly, the court cannot find that the act of monitoring Glenn's call with Silva amounted

16

to more than an ordinary incident of prison life, and, to the extent it could be considered an adverse act at all, the court finds it de minimis.  Glenn has therefore failed to allege facts sufficient to plausibly demonstrate an ability to satisfy the second element of a retaliation claim.

        2.   Causal Link

Glenn also assert he was removed from the FCC and denied video visits with his daughter, but states that these measures were imposed as consequences of the content of his phone call with Silva, not as acts of retaliation for filing a grievance. Where there appears a non-retaliatory reason for prison officials to take a particular action, a plaintiff must allege specific facts to support his assertion that any adverse act taken was actually caused by defendants' retaliatory animus. See Hannon, 645 F.3d at 48-49.  Aside from Glenn's conclusory assertion that the allegedly adverse acts were actually a response to his grievance, rather than, as stated by defendants, a response to Glenn's phone call with Silva, the record is devoid of any fact supporting a causal link between the adverse acts alleged and any retaliatory animus on the part of the defendants.  Accordingly, the retaliation claim should be dismissed.

III. <u>Marriage</u>

    A.   <u>Facts</u>

On September 29, 2009, Glenn sought permission to get married during his incarceration. Glenn's request was approved and his marriage was scheduled to take place on July 13, 2011. Shortly before that date, however, Glenn took a urine test that was positive for drugs, and subsequently pleaded guilty to a disciplinary charge. The positive drug test and disciplinary finding resulted in restrictions on Glenn's visitation privileges that prevented his scheduled marriage ceremony from proceeding.

Glenn states that he eventually did get married, but was not allowed to have the double-ring ceremony originally authorized. Glenn now wants the NHSP to allow him contact visits with his wife, and a ceremony where he and his wife can exchange rings.

    B.   <u>Legal Analysis</u>

The right to marry is a fundamental right, protected by the Fourteenth Amendment's due process clause, that survives incarceration, although the right to marriage is subject to "limitations imposed by prison life" as well as limitations

18

imposed by reasonable prison regulations.  Turner, 482 U.S. at
95 (citing Zablocki v. Redhail, 434 U.S. 374, 384-85 (1978)).
Glenn's complaint indicates that he was not prevented from
getting married.  Glenn asserts that the circumstances of his
marriage ceremony were impacted by restrictions on Glenn's
visitation rights, resulting from his own behavior.  Glenn has
failed to assert any facts that would allow the court to infer
that the restriction on his visits, consequent to his
disciplinary violation and drug test results, were not
reasonably related to the prison's legitimate interest in
preventing the introduction of drugs or other contraband to the
prison.  Accordingly, Glenn's claim regarding his right to marry
should be dismissed.

To the extent Glenn asserts a separate claim for the denial
of contact visits with his wife, he has similarly failed to
allege facts allowing the court to reasonably infer that the
challenged restriction on his visits was unreasonable under
Turner.  Accordingly, the claims, challenging the denial of a
double-ring ceremony and contact visits, should be dismissed.

IV.  <u>Conditions of Confinement in Closed Custody Unit</u>

    A.  <u>Facts</u>

Glenn states that while he was incarcerated at the Northern New England Correctional Facility ("NCF"), between April 2010 and July 2010, he was denied the right to exercise.  Glenn also asserts that he was denied "the right to be free from idle incar[c]eration" for one year while he was housed in the Closed Custody Unit ("CCU") at both the NCF and the NHSP.  Glenn claims that he was locked in his cell, in "torturous isolation" for twenty-one hours per day, and was not allowed to work, learn a trade, or exercise.  Glenn states that, as a result, he suffered from psychological stress; pain in his joints from arthritis; chest pains; and a worsening of his Post-Traumatic Stress Disorder, obesity, and hypertension.

On June 11, 2010, Glenn filed an inmate request slip with NCF Warden Larry Blaisdell complaining about the lack of out-of-cell and outside recreation time.  On July 6, 2010, Maj. Cox responded to Glenn in writing that he would speak to someone to address the issue.  On or around June 30, 2010, Glenn filed a grievance with the DOC Commissioner's office complaining about the lack of recreation or a recreation yard at NCF, and that CCU inmates were sent to a "dog kennel walkway" to exercise that, at fifty feet long and four and a half feet wide, was too small to

accommodate the exercise needs of thirty inmates at once.  Glenn
stated that both a gym and ball field were available to NCF
inmates in other security classifications.  On July 22, 2011,
Kench responded that the situation was being examined.

    B.   <u>Legal Analysis</u>

        1.   <u>Laaman Consent Decree</u>

Glenn asserts that the challenged conditions of his
confinement violate the prison's obligations established by the
Laaman Consent Decree.  The Laaman Consent Decree was originally
issued in 1978 and modified in 1990 in <u>Laaman v. Helgemoe</u>, Civ.
No. 75-cv-258 (D.N.H. filed Aug. 29, 1975), a class action
lawsuit filed in this court challenging conditions of
confinement at the New Hampshire State Prison.  On July 6, 2001,
the court approved a settlement agreement and stipulation of
dismissal in the <u>Laaman</u> case.  <u>See</u> <u>id.</u> (Doc. No. 523) (order
approving settlement agreement and stipulation of dismissal
issued July 6, 2001).  That order terminated federal court
jurisdiction over the matter, and provided that the 1990 consent
decree, as modified by the settlement agreement, would
constitute a final settlement agreement that would thereafter be
enforceable in the state courts of New Hampshire.  <u>Id.</u>  This
court therefore lacks jurisdiction over Glenn's claims based on

alleged violations of the Laaman Consent Decree.  Cf. Dupont v. Dubois, 99 F.3d 1128, *1 (1st Cir. 1996) (unpublished table decision) (order seeking to enforce federal or state court consent decree is unavailable in action under 42 U.S.C. § 1983). Accordingly, the claims asserting violations of the Laaman Consent Decree should be dismissed without prejudice to Glenn's right, to the extent he has such a right, to pursue such claims in state court.

### 2.   Eighth Amendment

While inmates are not guaranteed comfortable conditions, they are protected by the Eighth Amendment from conditions of confinement which amount to cruel and unusual punishment or conditions that are inhumane or deny the inmate the minimal measure of the necessities of civilized life.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Glenn alleges that the conditions of his confinement were inhumane in violation of the Eighth Amendment.

The court undertakes a two-part inquiry to determine if an inmate's Eighth Amendment challenge to the conditions of his confinement states a plausible claim.  First, the court must determine whether the conditions at issue were "sufficiently serious" so that "a prison official's act or omission . . .

result[ed] in the denial of the minimal civilized measure of life's necessities." Id. (internal quotations and citation omitted). If an inmate has established a sufficiently serious condition, the court must examine whether prison officials acted with "deliberate indifference" to the conditions in question. Wilson v. Seiter, 501 U.S. 294, 302 (1991). An official acts with "deliberate indifference" if he knows that an inmate faces a substantial risk of serious harm, and yet disregards that risk by failing to take reasonable measures to abate it. See Farmer, 511 U.S. at 847.

### a.   Programming

With respect to the claim regarding prison jobs and the lack of vocational training, Glenn has failed to show that the conditions at issue denied him the minimal civilized measure of life's necessities. See Figueroa v. Dinitto, 52 F. App'x 522, 523 (1st Cir. 2002) (prisoner's confinement to cell with another prisoner for 23-24 hours per day, without any opportunity to work or participate in educational, vocational, or rehabilitation programs, did not violate Eighth Amendment). Accordingly, the claim should be dismissed.

b.   Exercise

Exercise has been recognized as an "identifiable human need."  See Wilson, 501 U.S. at 304.  Glenn alleges that he was denied the ability to exercise in CCU.  Glenn also states, however, that he had three hours per day out of his cell, and that at NCF, he had access to a walkway which, while insufficient to accommodate the needs of all of the inmates on the unit, would apparently afford him some opportunity to exercise.  While Glenn describes a less than optimal opportunity for exercise, Glenn does not state sufficient facts to support a claim that he was denied exercise in a manner that was "sufficiently serious" to amount to a denial of a basic human need.  See Farmer, 511 U.S. at 834 (court must determine whether conditions are "sufficiently serious" so as to result in a "denial of the minimal civilized measure of life's necessities") (internal quotation marks and citation omitted).

Even if the court were to assume, without deciding, that the denial of exercise at NCF was "sufficiently serious" to support an Eighth Amendment claim, Glenn has failed to demonstrate that such denial was the result of "deliberate indifference" on the part of any prison official.  Glenn states that he grieved the conditions, and that he received responses from prison administrators that indicated that they were looking

into and addressing the situation.  Nothing in the complaint
indicates that the officials were aware of, but ignored or
failed to remedy, any serious risk of harm to Glenn.
Accordingly, Glenn has not alleged "deliberate indifference" on
the part of any defendant, and has therefore failed to state an
Eighth Amendment claim based on a deprivation of exercise.

V.    Eleventh Amendment

Glenn has asserted claims for damages and for injunctive
relief against the named defendants in their individual and
official capacities.  Claims for damages cannot be maintained in
federal court against unconsenting states and their agents,
absent Congressional abrogation of the State's sovereign
immunity.  See Fantini v. Salem State Coll., 557 F.3d 22, 33
(1st Cir. 2009); see also P.R. Aqueduct & Sewer Auth. v. Metcalf
& Eddy, Inc., 506 U.S. 139, 146 (1993).  New Hampshire has not
waived its immunity for such claims in federal court, and
Congress did not abrogate the state's Eleventh Amendment
immunity through 42 U.S.C. § 1983 or RLUIPA.  See Will v. Mich.
Dep't of State Police, 491 U.S. 58, 67 (1989) (§ 1983); see also
Sossamon v. Texas, 131 S. Ct. 1651, 1658-59 (2011) (RLUIPA).
Accordingly, the court should dismiss all claims for damages
asserted against defendants in their official capacities.

## Conclusion

In an order issued on this date, the court has directed service of the Free Exercise, RLUIPA, Establishment Clause, and equal protection claims on defendants Daly, Gerry, and Kench in their individual and official capacities.  For the reasons set forth in this report and recommendation, the court recommends that the remaining claims asserted and defendants named in the complaint be dismissed from this action.  Additionally, the court should dismiss the claims for damages to the extent they are asserted against defendants in their official capacities.

Any objections to this report and recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011), cert. denied, 132 S. Ct. 1045 (2012); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to review by district

court; issues not preserved by such objection are precluded on appeal).

_____
Landya McCafferty
United States Magistrate Judge

June 4, 2012

cc:  Charles Glenn, pro se

LBM/jba